UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE UNITED STATES OF AMERICA *ex rel*. MEHMET MUSTAFA KARADAĞ,<br><br>                         Plaintiff,<br><br>    v.<br><br>LUCHIANO VISCONTI LOUTIE LLC D/B/A LUCHIANO VISCONTI, SASHA HOURIZADEH, BARSAN GLOBAL LOGISTICS, INC., and TRIWAYS LOGISTICS, (USA) INC.,<br><br>                         Defendants. | No. __-cv-____<br><br>**FILED <u>IN CAMERA</u> AND UNDER SEAL PURSUANT TO 31 § 3730(b)(2)**<br><br>**DO NOT PLACE IN PRESS BOX**<br><br>**DO NOT ENTER ON PACER**<br><br>**<u>JURY TRIAL DEMANDED</u>**<br><br>**COMPLAINT FOR VIOLATION OF <u>THE FALSE CLAIMS ACT</u>** |

       1.    *Qui tam* relator Mehmet Mustafa Karadağ ("Relator") brings this action on behalf of himself and the United States Government (the "United States"), inclusive of The U.S. Department of Homeland Security, Bureau of Customs & Border Protection ("CBP" or "Customs"), under the provisions of the False Claims Act, 31 U.S.C. § 3729 *et seq*. (the "FCA"). This action seeks to recover damages and penalties arising from a fraudulent scheme to evade Customs duties on imports of men's apparel from Turkey, China, Taiwan, Portugal, and potentially other countries.

       2.    Relator is the General Manager of Karadağ Gomlek San. Ve Tic. Ltd.Sti. ("Karadağ"), an apparel designer and manufacturer in Istanbul, Turkey. Karadağ supplied men's shirts to defendant Luchiano Visconti Loutie LLC d/b/a Luchiano Visconti ("Luchiano"), a fashion wholesaler located in Mineola, New York. Except as to matters alleged on information and belief, the allegations herein are based on Relator's direct, independent, and personal knowledge of Karadağ's dealings with (i) Luchiano, (ii) its President, Chief Operating Officer,

1

and principal, defendant Sasha Hourizadeh ("Hourizadeh") (collectively, the "Luchiano Defendants"), and (iii) defendant Barsan Global Logistics, Inc. ("Barsan"), which has been Luchiano's Customs Broker since mid-2016.

3. From May 2012 through July 2017, Karadağ shipped goods to the Luchiano Defendants with an aggregate Transaction Value of approximately $4.97 million inclusive of "assists"[1]. The goods were imported via 56 shipments – 33 by sea and 23 by air – to the Port of New York and New Jersey. Luchiano or its designated Customs Broker – *i.e.*, Barsan or defendant Triways Logistics, (USA) Inc. ("Triways") – was the Importer of Record (the "Importer"). The applicable duty rate was 19.7%.

4. As alleged in detail below, in or about October 2017, Relator came to learn that Defendants knowingly filed or caused to be filed with Customs fraudulent customs entry summaries and doctored invoices understating the Transaction Value of the Karadağ goods by approximately 50%. By Relator's estimate, Defendants thereby evaded approximately $536,000 in lawfully owed duties on the shipments.

5. Relator additionally learned that Defendants knowingly engaged in a similar duty evasion scheme with respect to imports to Luchiano from other suppliers, not just Karadağ. On information and belief, Relator estimates that, on imports of approximately $5 million per year from at least eight other suppliers, Defendants unlawfully evaded approximately $500,000 in duties annually. By Relator's calculations, Defendants have thus evaded approximately $3 million in duties on Luchiano imports since 2012.

---

[1] An assist is an item that the buyer of imported merchandise provides, directly or indirectly, free of charge or at a reduced cost, for use in the production or sale of merchandise for export to the United States. The value of any assist is required to be included in the Transaction Value declared to Customs. 19 U.S.C. § 1401a(h)(1)(A); 19 C.F.R. § 152.103.

## JURISDICTION AND VENUE

6. This action arises under the FCA, 31 U.S.C. § 3729, *et seq*.

7. Jurisdiction over this action is conferred upon this Court by 31 U.S.C. § 3732(a) and 28 U.S.C. § 3130 in that this action arises under the laws of the United States.

8. Upon information and belief, this Complaint is not based on the facts underlying any pending related *qui tam* action within the meaning of the FCA's first-to-file rule, 31 U.S.C. § 3730(b)(5).

9. Upon information and belief, this Complaint is not based upon allegations or transactions that are the subject of a civil suit or an administrative civil money penalty proceeding in which the United States is already a party. 31 U.S.C. § 3730(e)(3).

10. Upon further information and belief, there has been no "public disclosure" of key facts alleged herein regarding Relator's discovery and investigation of the fraud.

11. Relator is an "original source" of information as defined by 31 U.S.C. § 3730(e)(4)(B) of the FCA.

12. Venue lies in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)-(d) in that Defendants transact and transacted business in this District and imported goods using fraudulent entry values through the Port of New York and New Jersey.

## PARTIES

13. Relator is a citizen of Turkey, residing in Istanbul. Relator is the general manager of Karadağ, a family-owned business engaged in the design and manufacture of men's, women's, and children's apparel which it supplies to customers in Europe, North America, Russia, the Middle East, and North Africa.

14. Defendant Luchiano is a Delaware limited liability corporation with is principal place of business located at 258 Herricks Rd, Mineola, N.Y., 11501. Luchiano describes itself as a wholesaler of high-quality men's clothing to major department stores, upscale boutiques, and other retail clothing stores.

15. Defendant Hourizadeh is an individual believed to reside at 11 Birchwood Lane, Great Neck, N.Y., 11024. Hourizadeh is the President, Chief Operating Officer, and, on information and belief, a principal, of Luchiano.

16. Defendant Luchiano and Hourizadeh are collectively referred to herein as the "Luchiano Defendants."

17. Defendant Barsan is a New York corporation with its principal place of business located at 36 West 44th Street, Suite 1212, New York, N.Y. 10036, and a second, relevant place of business located at 17-09 Zink Place Unit 5, Fair Lawn, N.J. 07410. Barsan is a licensed Customs Broker and a subsidiary of Barsan Global Lojistik A.S., an international freight forwarding, transportation, and logistics firm headquartered in Istanbul, Turkey.

18. Defendant Triways is a Delaware corporation with its principal place of business located at 11938 South La Cienega Blvd., Hawthorne, CA 90250. Triways is a licensed Customs Broker and a freight forwarding, transportation, and logistics firm with offices in the United States, China, Singapore, and Thailand.

19. The Luchiano Defendants, Barsan, and Triways are collectively referred to herein as "Defendants."

## FACTUAL ALLEGATIONS

**A.     Customs Duties**

20.     All merchandise imported into the United States is required to be "entered" unless specifically excepted. 19 U.S.C. §1484; 19 C.F.R. § 141.4(a). "Entry" means, among other things, that an Importer or its agent (usually a licensed Customs Broker acting on behalf of the Importer) must file appropriate documents with an officer of CBP that allows Customs to assess the customs duties due on the merchandise being imported. 19 C.F.R. § 141.0a(a).

21.     Among the entry documents that are required to be filed are a CBP Form 7501 "Entry Summary" together with a "Commercial Invoice". 19 C.F.R. §142.3a. Importers are required to declare under oath that the prices and all other statements set forth on these documents are true and correct. *See* 19 U.S.C. § 1485; 19 C.F.R. § 142.6.

22.     Specifically, the Entry Summary includes a declaration to be subscribed by the Importer or its authorized agent that:

> the merchandise was obtained pursuant to a purchase or agreement to purchase and that ***the prices set forth in the invoices are true . . .*** and ***the statements in the invoices as to value or price are true to the best of my knowledge and belief***. I also declare that the statements in the documents herein filed ***fully disclose to the best of my knowledge and belief the true prices***, values, quantities, rebates, drawbacks, fees, commissions, and royalties and are true and correct, and ***that all goods or services provided to the seller of the merchandise either free or at reduced cost are fully disclosed***.

(Emphasis added).

23.     The Importer or its agent must declare on the Entry Summary that "I certify that the above information is accurate . . . and that all requirements of 19 CFR Part 142 have been met."

24.     The Commercial Invoice must "set forth . . . (5) ***The purchase price of each item*** in the currency of the purchase, if the merchandise is shipped in pursuance of a purchase or an agreement to purchase . . ." 19 C.F.R. § 141.86(a)(5). (Emphasis added).

25. Under Section 484 of the Tariff Act, as amended (19 U.S.C. § 1484), the entity serving as the "Importer of Record" (previously defined as the "Importer") is responsible for using "reasonable care" to enter and determine the value of imported merchandise and to provide any other information necessary to enable Customs to properly assess duties and determine whether applicable legal requirements have been met.

26. The Importer is also required to maintain – and to submit to Customs upon request – all relevant documentation, including Commercial Invoices, supporting their Entry Summaries. *See* 19 C.F.R. §§ 141.11, 141.19(a), 141.81, 141.86(a), 142.3(a), 142.6(a).

27. Additionally, the Importer has an ongoing obligation to report to CBP if it discovers that prices declared at entry were incorrect. Specifically, pursuant to 19 U.S.C. § 1485(a), the Importer is required to affirm in the Entry Summary that it "***will produce at once*** to the appropriate customs officer any invoice, paper, letter, document, or information received showing that any such prices or statements are not true or correct." (Emphasis added).

**B. Customs Brokers**

28. Customs Brokers are licensed and regulated by CBP to assist Importers in meeting Federal requirements. Customs Brokers submit necessary information and appropriate payments to CBP on behalf of their clients and charge them a fee for this service.

29. Pursuant to 19 C.F.R. § 111.29, Customs Brokers "must exercise due diligence in making financial settlements . . . and in preparing or assisting in the preparation and filing of records relating to any customs business matter handled by him as a broker." *See* 19 U.S.C. § 1641.

30. Additionally, pursuant to 19 C.F.R. §111.32:

A broker must not file or procure or assist in the filing of any claim, or of any document, affidavit, or other papers, known by such broker to be false. In addition,

a broker must not knowingly give, or solicit or procure the giving of, any false or misleading information or testimony in any matter pending before the Department of Homeland Security or any representative of the Department of Homeland Security.

31. Further, under 19 C.F.R. § 111.32, Customs Brokers must "exercise responsible supervision and control" over the business they conduct.

### C. The FCA and Its Applicability to Customs Fraud

32. The FCA, which was originally enacted in 1863, was substantially amended in 1986 by the False Claims Amendments Act, Pub. L. 99-562, 100 Stat. 3153, to enhance the Government's ability to recover losses as a result of fraud. Among other things, the amendments created incentives for individuals with knowledge of fraud on the United States to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the Government's behalf. The FCA is intended to reach all types of fraud, without qualification, that might result in financial loss to the Government.

33. The FCA as amended includes a reverse false claims provision that imposes liability on a party that, by false statement, seeks to conceal, avoid, or decrease an obligation to pay the United States. 31 U.S.C. § 3729(a)(1)(G).

34. All goods imported into the United States are taxed according to the Harmonized Tariff Schedule of the United States ("HTS") (codified at 19 U.S.C. § 1202). Under Customs regulations, importers have an existing, non-contingent and nondiscretionary liability for Customs duties. *See*, *e.g.*, 19 C.F.R. §§ 141.4, 159.2 (demanding entry and liquidation of imported merchandise); 19 U.S.C. § 1503 (assessment of duties on imports is generally based on the appraised value of the imported goods as determined on liquidation). Such liability arises immediately and automatically upon the importation of goods into the United States. 19 C.F.R. § 141.1(b)(1).

35. Accordingly, false statements or records made to avoid or decrease Customs obligations are actionable under the FCA's reverse false claims provision, 31 U.S.C. § 3729(a)(1)(G).

36. Collecting import duties is a key function of CBP, which is one of the largest law enforcement agencies in the United States. CBP relies on Importers' Entry Summaries and supporting documentation to assess and collect the appropriate amount of import duties owed to Customs. CBP tenaciously enforces duty obligations through both the Customs Administrative Enforcement Process and actions under the FCA.

### D. Karadağ's Transactions with Luchiano

37. Karadağ began supplying apparel to Luchiano in May 2012. The apparel that Karadağ sold to Luchiano consisted of "Men's or Boys' Shirts" subject to a duty rate of 19.7% pursuant to Chapter 62 (specifically, classification 6205.20.20) of the HTS.

38. Karadağ was responsible for obtaining the appropriate export clearances for the goods from the Turkish government.

39. The Luchiano Defendants, however, insisted that the transactions be structured Free on Board or "FOB" Shipping Point. This meant that Luchiano accepted delivery of the goods at the Karadağ factory's shipping dock in Istanbul. Thereafter, Luchiano was responsible for transporting the goods to the Port of Export, loading them onto the carrier's vessel, shipping them to the United States, and entering them through U.S. Customs.

40. Luchiano or its designated Customs Broker was the Importer in connection with U.S. Customs entry. Luchiano used Triways as its Customs Broker through June 9, 2016, for its shipments by air, and through October 14, 2016, for those by sea. After those dates, Luchiano switched to using Barsan as its Customs Broker.

41. Notably, in addition to being Luchiano's Customs Broker, Triways and then Barsan provided freight forwarding services to Luchiano in Turkey. In this capacity, Triways and Barsan, acting through local Turkish affiliates and/or agents,[2] accepted delivery of the goods from Karadağ, transported them to the Port of Export, and loaded them aboard the carrier's vessel on Luchiano's behalf.

42. Consistent with standard commercial practice, Karadağ issued a Commercial Invoice to Luchiano with respect to each shipment. Karadağ prepared the invoices using Microsoft Excel, saving each as an unalterable PDF file. The invoices listed, *inter alia*, descriptions of the merchandise, the quantities, and the purchase price of each item.

43. Karadağ packaged a printout of each invoice with the shipment and emailed a copy to Luchiano.

44. In addition, Karadağ, acting though its Turkish export broker, INANC Logistics ("INANC"), filed the original of each invoice – along with the original bill of lading and an export declaration – with Turkish Customs authorities to obtain export clearance.

45. After securing such clearance, INANC provided the original export documentation – including the original invoice – to Triways and Barsan, which were required to present that original documentation to the carrier for permission to load the goods.

46. From May 5, 2012 through July 15, 2017, Karadağ sold Luchiano 56 shipments of shirts – 33 by ocean and 23 by air. Each was entered via the Port of New York and New Jersey. By Relator's calculation, the aggregate Transaction Value (*see* 19 C.F.R. § 152.103) of the shipments was $4.97 million. This included $4.49 million in invoice value plus an additional

---

[2] Triways used four local agents in Turkey – Tay International Forwarding, Mars Logistics Group, TNT Express, and Ruslink. Barsan used its Turkish affiliate, Barsan Global Logistics, AS.

$479,000 in "assists".

47. The assists consisted of fabric that the Luchiano Defendants sourced from factories in Europe and Asia and arranged to have delivered directly to Karadağ for its use in manufacturing the subject apparel. The value of the assists is reflected in the factories' invoices which Karadağ received and filed with Turkish customs authorities.[3]

48. At the applicable duty rate of 19.7%, the Luchiano Defendants should have paid an aggregate of approximately $985,000 in Customs duties on their shipments from Karadağ.

**E. Defendants' Insistence on Receiving the Excel Files of the Invoices**

49. At or about the time of Karadağ's first shipment, Luchiano Defendants made an unusual request. Specifically, the Luchiano Defendants asked Karadağ to provide Defendants with copies of the Excel files of the invoices, and not just the unalterable PDFs.

50. Relator assumed that the Luchiano Defendants wanted the Excel files to make it easier to transfer the relevant transaction data to their computer system. Eager to satisfy the requirements of an important customer, Karadağ complied with the Luchiano Defendants' request, regularly emailing the Luchiano Defendants the invoice files in Excel.

51. Occasionally, Karadağ would provide the invoices in PDF only. In response, the Luchiano Defendants would insist that Karadağ also supply the Excel files.

52. For example, on December 14, 2015, Hourizadeh emailed Karadağ "can you please email me the Customs Invoice in a [sic] Excel format please :)."

53. Similarly, on December 24, 2015, Hourizadeh wrote "please also I need the Customs Invoice as well in EXCEL FORMAT please".

---

[3] Turkey entitles manufacturers of products for export to import raw materials or intermediate products at low or duty-exempt duty rates, subject to the posting of a transit deposit for duties otherwise owed. Karadağ filed the fabric invoices with Turkish authorities in connection with the posting and release of transit deposits.

54. And on January 9, 2016, Hourizadeh emailed "Thank you very much but I need the Customs invoice to be in Excel format. Please if you can email it to me in Excel format. Please."

55. Over time, the Luchiano Defendants began to refer to unspecified modifications that they intended to make to the Excel files and to transmitting those files to Barsan. The Luchiano Defendants also began expressing frustration and even panic when the Excel files were not immediately forthcoming.

56. For example, on June 8, 2017, defendant Hourizadeh emailed Karadağ stating: "The CUSTOMS INVOICE is not on Excel how come? Please send it to me on EXCEL ASAP As [sic] ***I need to work on it***. PLEASE SEND ASAP I need it in EXCEL". (Emphasis added, capitalization in original).

57. Then, on June 14, 2017, after receiving the Excel files, Hourizadeh emailed: "Thank you for the Customs invoice and packing list. As [sic] ***I have gone over them and fixed them*** and forwarded them to Barsan." (Emphasis added).

58. Similarly, on July 7, 2017, Hourizadeh wrote Karadağ customer representative Nuray Karadağ via the WhatsApp instant messaging application: "Hello Nuray . . . I need the paper work today as you know ***I need to play with the excel sheet before I give it to Barsan***". (Emphasis added).

59. Additionally, on or about October 7, 2017, Hourizadeh messaged Nuray Karadağ: "Can you send all of it in excel format please. It is important…I need it Nuray. As ***I need to adjust the EXCEL SHEET*** as it is urgent". (Emphasis added, capitalization in original).

F. **Relator's Discovery of the Fraud**

60. By fall 2017, the parties' business relationship had begun to deteriorate as Luchiano withheld payments from Karadağ. It appeared to Relator that Luchiano was planning on dropping

11

Karadağ and switching to a new shirt supplier. Relator made plans to travel to New York to see if he could mend the relationship and negotiate the balance due.

61. Prior to his trip, on or about September 20, 2017, Relator telephoned Barsan. Relator told Barsan about the Luchiano Defendants' insistence upon receiving the Karadağ invoices in Excel. Relator also told Barsan that he suspected that the Luchiano Defendants were doctoring the Excel files to prepare fraudulent invoices for Barsan to submit to Customs. Relator suggested that Barsan investigate the matter.

62. Approximately two weeks later, on or about October 4, 2017, Relator traveled to New York. After meeting with the Luchiano Defendants on Long Island on or about October 4, 2017, Relator visited the Fair Lawn, New Jersey, offices of Barsan.

63. There, on or about October 5, 2017, Relator met with Barsan Director and Vice President Sevgi Cebe ("Cebe") and Operations Specialist Eren Yuceer ("Yuceer") and pressed them for information about the invoices that Luchiano was using for Customs entry.

64. Cebe and Yuceer responded that Barsan had investigated and determined that Relator's suspicions appeared to be correct. Specifically, Cebe and Yuceer informed Relator that they had compared the original Karadağ invoices – which Barsan had received from INANC in Turkey – with those that the Luchiano Defendants had provided Barsan for Customs entry.

65. Cebe and Yuceer claimed that they had thereby discovered – much to their purported surprise – that the two sets of invoices did not match. Specifically, as Cebe and Yuceer acknowledged, the prices on the invoices supplied by the Luchiano Defendants for Customs entry were approximately 50% lower than those on the originals that Barsan had received from INANC.

66. Cebe and Yuceer acknowledged that the discrepancies suggested that the Luchiano Defendants had in fact fraudulently doctored the Excel files before sending them to Barsan.

67. Relator asked Cebe and Yuceer for copies of the fraudulent invoices. Cebe and Yuceer refused, citing a duty that they believed Barsan owed to the Luchiano Defendants not to release their confidential Customs information. Cebe and Yuceer did, however, pull up one of the doctored invoices on a computer monitor for Relator to see.

68. The erroneously understated prices were apparent to Relator on the face of the document that Relator was shown.

69. Cebe and Yuceer also told Relator that, after uncovering the discrepancies in the invoices, they had confronted the Luchiano Defendants, admonished them to stop and warned that they could incur substantial legal liability, including by a whistleblower lawsuit. According to Cebe and Yuceer, Hourizadeh thanked them for the warning.

G. The Ongoing Nature of the Scheme

70. On information and belief, the Luchiano Defendants' duty avoidance practices predated their use of Barsan as their Customs Broker. Relator is informed and believes that the Luchiano Defendants engaged in the same doctored-invoice scheme in connection with the transactions for which they used Triways as their Customs Broker. Relator's information and belief is based, *inter alia*, on the fact that the Luchiano Defendants insisted on receiving the Excel files of the invoices from the inception of their dealings with Karadağ, not just after Barsan entered the picture as Luchiano's Customs Broker. Accordingly, on information and belief, the scheme alleged herein has been ongoing since at least 2012.

H. Defendants' Failure to Declare the Value of the Assists to CBP

71. On information and belief, the Luchiano Defendants' duty avoidance scheme involved not just doctored invoices, as alleged above, but also a failure to declare the assists that Luchiano provided Karadağ.

72. The value of any type of assist must be declared and added to the transaction value of imported merchandise in order to obtain the correct value for Customs duty purposes. *See What Every Member of the Trade Community Should Know About: Customs Value*, CBP July 2006, at 11-13; *see also* 19 U.S.C. § 1401a(h)(1)(A); 19 C.F.R. § 152.103. CBP compliance guidance states that Importers should ask foreign vendors to "include[] assist values on invoices" and ensure that "the Customs Broker includes assist values on entries." *U.S. Customs and Border Protection Office of Strategic Trade Regulatory Audit Division Focused Assessment Program Example of Internal Control Manual*, October 2003, at § 6.3.

73. As alleged above, the Luchiano Defendants supplied Karadag with $479,000 in fabric "assists".

74. The Luchiano Defendants never requested that Karadağ reference the assists on its invoices.

75. Furthermore, on information and belief, the Luchiano Defendants concealed the existence of the assists from Barsan and Triways, thereby ensuring that they would not be declared to Customs and that their value would not be added to the declared Transaction Value or appear on the Entry Summaries.

76. Accordingly, the assists were omitted from the invoices and Entry Summaries. As a result, Luchiano evaded the duties owed on 100% of the value of the assists.

77. By Relator's estimate, as result of the foregoing – including the omitted assists – approximately $536,000 in lawfully owed duties were evaded with respect to Karadağ's shipments to Luchiano.

78. At all times, the falsity of the Entry Summaries and invoices filed by Defendants with Customs were material to CBP's assessment and collection of duties and caused CBP to

collect less than the amount of duties properly owed.

79. Attached as Exhibit A is a schedule showing each shipment to Luchiano from Karadağ, including the arrival date, original invoice value, assist value, false Transaction Value which Relator is informed and believes Defendants declared to Customs, and the duties that Relator calculates Defendants owed, paid, and evaded.

**I. Defendants' Evasion of Duties on Imports from Additional Suppliers**

80. At the October 5, 2017, meeting in Fair Lawn, New Jersey, Cebe and Yuceer volunteered to Relator an additional fact – namely, that the Luchiano Defendants' chicanery did not appear to be limited to its imports from Karadağ. Rather, Barsan had investigated Luchiano's transactions with other overseas suppliers, and discovered similar discrepancies.

81. Specifically, Cebe and Yuceer informed Relator that Barsan had contacted other suppliers of Luchiano and requested copies of their original invoices. Barsan had then compared those invoices with the ones supplied by the Luchiano Defendants for Customs entry. Sure enough, the latter contained understated prices too, according to Cebe and Yuceer.

82. Luchiano has imported goods from at least eight other overseas suppliers since 2012:[4]

| Additional Overseas Suppliers | Country | No. of Shipments |
|---|---|---|
| Inter Gurup Tekstil | Turkey | 4 |
| Leopar Tekstil. Deri Turizm | Turkey | 2 |
| Skymate International Co. Ltd. | China | 20 |
| Soci 4 Confeccoes Texteis LDA | Portugal | 1 |
| Taiwan Display Fixtures Co., Ltd. | Taiwan | 1 |
| TGS Dis Ticaret AS | Turkey | 1 |
| Zamate Tekstil | Turkey | 3 |
| Zhejiang Cathaya Transtra Co., Ltd. | China | 5 |

---

[4] This chart only includes sea port entries. Import data for air shipments are not publicly available.

83.     Relator believes, based on his knowledge of the industry and Luchiano's business, that the value of those imports is roughly $5 million in a year.  Thus, on information and belief, Defendants have evaded approximately $500,000 in duties annually or approximately $3 million since 2012 with respect to imports from Luchiano's other suppliers, in addition to the approximately $536,000 evaded on shipments from Karadağ.

### J. Additional *Scienter* Allegations

84.     To establish a violation of the FCA, a relator must show that the defendant acted "knowingly" in using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government or concealing or avoiding or decreasing an obligation to pay or transmit money or property to the Government.  31 U.S.C. § 3729(a)(G).  This *scienter* requirement is satisfied if the defendant: (1) had actual knowledge that the claim is false; (2) acted in deliberate ignorance of the truth or falsity of the claim; or (3) acted in reckless disregard of the claim's truth or falsity.  31 U.S.C. § 3729(b)(1)(A).  Proof of specific intent to defraud is not required.  *Id*. at (b)(1)(B).

85.     At all relevant times, the Luchiano Defendants acted with the requisite *scienter* under the FCA in that they had actual knowledge that the Entry Summaries and invoices filed with Customs were false.  The Luchiano Defendants knowingly requested and obtained the Excel files of the invoices, doctored them to reduce the prices, then passed off such documentation to Barsan and Triways as invoices for use in Customs entry.  Furthermore, at all relevant times, the Luchiano Defendants knew and expected that CBP would rely on the false representations and values stated in the entry documentation and, as a result, would collect less than the amount of duties properly owed.

86.     At all relevant times, Barsan and Triways acted with requisite *scienter* under the

FCA in that they acted, at minimum, in deliberate ignorance and/or in reckless disregard of whether the entry documents they filed were false by ignoring and disregarding the original invoices that they received from INANC and entering the goods, instead, using the nonoriginal invoices supplied by the Luchiano Defendants.

87. The use of nonoriginal invoices when the originals were available constituted a red flag that should have prompted Barsan and Triways to suspect fraud and investigate.

88. "There is no reason why an importer shouldn't give the manufacturer's original invoice to customs. It reflects the actual shipment . . . When we see double invoicing, it's an indication of possible fraud," according to CBP. *Trust but Verify – How CBP textile teams protect America's jobs and economy*, Frontline, U.S. Customs and Border Protection, Vol. 5, Issue 2.

89. Indeed, CBP has warned that it is a "red flag" of potential Transaction Value fraud when "Company frequent uses pro forma invoices or invoices indicating 'Customs Use only,' 'Customs Purposes Only,' or 'Free-house delivery'". *U. S. Customs and Border Protection Office of Strategic Trade Regulatory Audit Division Focused Assessment Program*, October 2003.

90. By accepting the nonoriginal invoices and not using the originals or checking to ensure that the prices matched, Barsan and Triways acted, at minimum, with deliberate ignorance and/or in reckless disregard of whether the entry documents they filed with CBP were true or false, thereby violating the FCA.

91. Barsan and Triways were not entitled to rely on the nonoriginal invoices supplied by the Luchiano Defendants while turning a blind eye to the originals which they possessed and/or to which they had access through their agents. As alleged above, Customs Brokers have a duty to exercise "due diligence", 19 U.S.C. § 1641, and are required to "exercise responsible supervision and control", 19 C.F.R. § 111.32. Furthermore, Customs Brokers are prohibited from submitting

17

or assisting in the submission of false documents to CBP.  19 C.F.R. § 111.32.  By failing to use the original invoices for Customs entry or even attempting to reconcile the nonoriginals supplied by the Luchiano Defendants with the originals, Barsan and Triways did not exercise the requisite "due diligence" or "supervision and control", and improperly filed false documentation with CBP.

92. Moreover, as alleged above, Importers have an ongoing obligation to report and correct erroneous entry prices.  19 U.S.C. § 1485(a).  Since at least October 2017, Barsan admittedly has had actual knowledge of the false entry prices alleged above, yet, on information and belief, has failed to report the relevant facts to CBP.  Given the existence of a duty to report under 19 U.S.C. § 1485(a), Barsan's failure to do so when it had actual knowledge of the fraud violated the FCA.

93. Barsan's failure to report is additionally probative of its recklessness and/or deliberate ignorance.  It suggests that Barsan feared that reporting would lead to CBP's discovery of its misconduct as described in this complaint.

## FIRST CLAIM FOR RELIEF
## VIOLATION OF 31 U.S.C. § 3729(a)(1)(G)

94. Relator incorporates the allegations contained in the foregoing paragraphs.

95. By virtue of the acts described above, Defendants violated and continue to violate the FCA by evading applicable import duties on apparel in that they thereby knowingly made, used, or caused to be made or used, false records or statements material to obligations to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased obligations to pay or transmit money or property to the Government.

96. By reason of Defendants' actions, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF 31 U.S.C. § 3729(a)(1)(C)

97. Relator incorporates the allegations contained in the foregoing paragraphs.

98. By virtue of the acts described above, Defendants have acted in concert and tacitly agreed with each other and with other conspirators to violate the FCA by evading applicable import duties on apparel in that they thereby knowingly made, used, or caused to be made or used, false records or statements material to obligations to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased obligations to pay or transmit money or property to the Government (31 U.S.C. § 3729(a)(1)(G)).

99. Defendants committed the overt acts described above in furtherance of the conspiracy, including but not limited to, misstating the prices of Men's and Boy's Shirts or otherwise illegally avoiding the obligation to pay duties that were owed.

100. Defendants' conspiracy violates 31 U.S.C. § 3729(a)(1)(C), by which Defendants obtained entry of goods into the United States without paying amounts due to the United States.

101. By reason of Defendants' conspiracy, the United States has been damaged, and continues to be damaged, in a substantial amount.

## PRAYER FOR RELIEF

**WHEREFORE**, Relator, on behalf of himself and the United States Government, prays that judgment be entered and against Defendants as follows:

a. That the United States Government be awarded three times the amount of damages sustained because of Defendants' actions, plus a civil penalty of not less than $11,181 and not more than $22,363, for each false document presented or caused to be presented to CBP, and the costs of this action, with interest, including the costs to the United States Government related to this action;

    b.    That the Relator be awarded all costs incurred, including reasonable attorneys' fees and costs;

    c.    That, in the event the United States continues to proceed with this action, the Relator be awarded an amount that the Court decides is reasonable for bringing this action of at least 15% but not more than 25% of the proceeds of the action or the settlement of the claim;

    d.    That, in the event the United States does not proceed with this action, the Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be not less than 25% nor more than 30% of the proceeds of the action or settlement of the claim;

    e.    That the Relator be awarded prejudgment interest;

    f.    That a trial by jury be held on all issues; and

    g.    That the Court enter an Order granting such other relief as this Court deems just and appropriate.

## JURY DEMAND

Relator, on behalf of the United States, hereby demands a trial by jury in this action on all issues.

Dated: December 3, 2018                           Respectfully submitted,

                                                **KIRBY McINERNEY LLP**

                                                By: /s/ Mark A. Strauss

                                                Mark A. Strauss
                                                825 Third Avenue, Floor 16
                                                New York, NY 10022
                                                Tel: (212) 371-6600
                                                Fax: (212) 751-2540
                                                mstrauss@kmllp.com

                                                *Counsel for Relator Mehmet Mustafa Karadağ*